# CONSOLIDATED GAS ELECTRIC LIGHT AND POWER COMPANY

## vs.

## OSCAR D. GREEN.

*Contributory Negligence—Placing Head in Elevator Shaft.*

In case of doubt in the mind of the court as to whether an act of plaintiff constitutes contributory negligence, it becomes a question for the jury.                                    p. 511

Whether the act of one seeking to use an elevator, before it was regularly equipped and in full and regular operation, in putting his head in the shaft for the purpose of calling the elevator constituted negligence, *held* a question for the jury, his conduct under the circumstances not being such as to leave no room for difference of opinion in the minds of reasonable men.
                                                        pp. 511, 512

The refusal of a prayer of defendant, which omitted to require a finding of failure by plaintiff to exercise reasonable care, *held* not reversible error, particularly since a granted prayer of defendant correctly and clearly stated the proposition of law involved in the prayer refused.                    p. 511

*Decided January 12th, 1921.*

Appeal from the Court of Common Pleas of Baltimore City (HEUISLER, J.).

Appellant's (defendant's) prayers were as follows:

*First Prayer.*—The court instructs the jury that the undisputed evidence in this case shows that the accident complained of was caused by negligence on the part of the plaintiff and the verdict of the jury shall, therefore, be for the defendant.

*Second Prayer.*—The court instructs the jury that the plaintiff has offered no evidence in this case legally sufficient

to entitle him to recover against the defendant, and the verdict of the jury shall, therefore, be for the defendant.

*Fourth Prayer.*—The jury are instructed that their verdict should be for the defendant unless they find from the evidence that the injury complained of was occasioned by the negligence of the defendant, and that the plaintiff, at the time of the injury, was himself free from negligence directly contributing thereto.

*Fifth Prayer.*—The jury are instructed that the burden is upon the plaintiff to establish the negligence of the defendant by a preponderance of evidence, and that if the evidence in the case leaves the minds of the jury in a state of equipoise as to whether the defendant was negligent, then their verdict should be for the defendant.

*Sixth Prayer.*—The court instructs the jury that if they find from the evidence that the plaintiff, by putting his head into the elevator shaft referred to, failed to exercise the care that a person of ordinary prudence should have exercised under similar circumstances, then the verdict of the jury must be for the defendant.

Appellee's (plaintiff's) second prayer was as follows:

The plaintiff prays the court to instruct the jury that if they find that the defendant requested the plaintiff to enter its building on Lexington and Liberty Streets, described in the evidence, and invited him to use the elevators in operation therein which were in an unfinished condition, then it became the duty of defendant, its agents and servants to use ordinary care in operating said elevator to prevent the plaintiff from suffering any injuries while he was using or attempting to use the elevator on said premises, provided the plaintiff exercised that degree of care which a reasonably prudent man would have exercised under the circumstances while using or attempting to use the elevator so operated by defendant.

Appellant specially excepted to the above prayer as presenting an abstract question of law.

The cause was argued before Boyd, C. J., Briscoe, Thomas, Pattison, Urner, Stockbridge, and Adkins, JJ.

*Edgar Allan Poe* and *E. M. Sturtevant,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellant.

*William L. Marbury,* with whom was *L. Wethered Barroll* on the brief, for the appellee.

Adkins, J., delivered the opinion of the court.

Oscar G. Green, the appellee in this case, was severely injured while attempting to signal one of the elevators of the appellant in the Lexington Street Office Building on November 8th, 1919.

The building had not been quite completed, but elevators had been installed, and were being used for the purpose of conveying materials, workmen and prospective tenants of the offices to and from the upper floors, of which there were twenty-one. There are eight passenger elevators, four on the east and four on the west side of the corridor leading from the Lexington Street entrance. There was one open well on each side in which the four elevators ran, with the necessary steel framing to give each elevator its own shaft, but not enough to enclose the shaft, or screen one from the other. Nos. 7 and 8 adjoined each other and were on the east side of the corridor.

No call bells had been attached, or signals of any kind, to enable those wishing to use the elevators to attract the attention of those operating the elevators, but gongs had been placed in the elevator to warn those working in and about the elevator shafts when the elevators were being, or about to be, moved. The primary purpose of the gongs was to warn workmen at the bottom of the shafts who were engaged in tiling the ground floors. It was the duty of the elevator boys to ring these gongs before starting the elevators, and intermittently while they were in motion. The speed capacity of these elevators was about seven hundred feet a minute.

For some time after the installation of the elevators they were raised and lowered by what are known as hoisting cables, but later a system known as compensating cables was introduced.    Just when the change was made is one of the questions as to which there is a conflict of testimony.    Appellee was president of the Agus Shade Carrier Company, which had the contract to supply shades for the windows. In connection with this work it was necessary for him to visit the building frequently and to use the elevators in going from floor to ·floor.    At the request of Alexander B. Evans, manager of the building for appellant, an appointment had been made for a meeting at the building on the morning of the accident, and on his way to meet the engagement appellee met Evans on the street and was told by him that it was impossible for him to turn back then as he had an important meeting requiring immediate attention, and was requested to proceed to the building and look after matters there on which appellee's men were employed.    He arrived there between twelve and half past twelve o'clock, took the elevator known as No. 7, and was carried to the seventeenth floor. It being dinner hour, he did not find his men at work, but inspected what they had been doing, and then went to elevator No. 7 intending to return to his office.    This was between twelve o'clock and twelve-thirty.    What then happened, as testified to by appellee, was as follows: "It was lunch hour; the building was comparatively silent; that is, it was possibly the most silent hour of the day when there was work going on.    I went up to the elevator shaft, made the usual alarms, rattling the door; they were all more or less loose in there and the iron not having been fastened up securely, and the tracks not straight, so you could make a little fuss rattling the doors; whistled and called '17th floor' or 'Bring your elevator,' or something of that kind, trying to attract his attention.    Then not having any response or not hearing the elevator, the cables in front of me being apparently stationary, I could not notice any movement of them, I walked

down to the extreme south end of the building and retraced my steps after glancing out of the window, killing time waiting for the car."

It appears from the record that No. 8 elevator, adjoining No. 7, was at that particular time not being used, although it was then operated interchangeably with No. 7.

The witness was asked why he didn't call down the shaft at the point where the elevator was not then running. He answered: "The door was open, and there was more or less debris around on the floor, and I did not want to expose myself by taking a chance on falling in an open place. The other part was kind of a cage; there was nothing but the square openings, and I could put my head through, and if a foot did slip I would fall up against the other and not down the shaft." "I think there was quite a bit of sand, which shifts badly under your feet." (The witness had previously testified that the door was in place at No. 7, but the glass had not been put in.)

Describing his return to No. 7 after walking to the window, witness said: "I walked to the entrance door and rattled the door and called, and then, not getting any response and having in mind that I had been there before and had walked down to the door, and all, and sufficient time had elapsed for the boy to come up had he heard me at all or had he been willing to respond; and, seeing the cables hanging and being positive in my mind that those were the hoisting cables, to my knowledge there not having been any cables placed underneath the car, and knowing from having taken the matter up in person with Mr. Evans and with the foreman of the elevator company, * * * then I walked to the extreme right of the entrance" and "placed my head through one of the doors." "I put my head through in this position, just enough to get my mouth over so my voice would carry down, and the minute—just as I did that I saw nothing but the bottom of the shaft; there was no car down there, as I had every reason to suppose and believe was there; there was nothing

but the bottom of the shaft." "I immediately jerked my head back to get it out." "Just as I did the elevator tapped me on the back of the head." "Q. A descending elevator? A. Yes; a descending elevator. Q. Where was the elevator when you put your head in? A. It was above me, on either the 18th or 19th or 20th floors, I don't know which one, but it was above instead of below. Q. Did you hear it coming? A. No, sir; you could not hear those cars coming; they were noiseless. Q. Did you hear any bell rung? A. No, sir; that is the reason of my having to put my head through the door. There was no bell rung. When I first went there I listened, and when I went back the second time I listened for the bell. Q. You were listening for the bell? A. Yes, sir; I was listening for the bell at the time I made these alarms and shaking the door and calling and whistling. Q. The building was comparatively quiet, you say? A. Yes. Q. You know that there was no bell rung? A. Yes; there was positively no bell rung while I was at the elevator."

The testimony of both appellee and of Mr. Evans, who was then the manager of appellant's building, was that the compensating cables had been put on elevator No. 7 just before the accident. Appellee testified that a few days before the accident, in conversation between appellee and the foreman in charge of the erection of the elevators, at which Evans was present, the foreman said it might be several days longer before he could get No. 7 equipped with compensating cables, a week or such a matter. Evans' version of the foreman's statement was that he said "he would try to give us the car some time soon. * * * He did not specify a week or ten days, or did not specify one day."

Appellee admitted on cross-examination that he knew it was dangerous to put one's head in an elevator shaft, and that on another occasion he had warned Evans of the danger when he saw him doing it. His excuse for doing it on the occasion of the accident was that there was no other way to attract the attention of the elevator boy; that he did not

know the compensating cables had been put in and therefore thought, when he saw the cables hanging taut and steady, that they were the hoisting cables above the car and that the car was below; as with the hoisting system, what one saw when the car was above him was loose, dangling chains hanging from one side of the car, and not from the middle; that he had failed to get a response to his first efforts to attract the attention of the boy, and supposed, as the bell was not ringing and it was the noon hour, the boy was below eating his lunch.

Not only appellee, but Evans and one or more other witnesses, testified it was customary to call up and down the shaft for the boy, and that it was necessary to do so in order to get him.

The negligence attributed to appellant was the failure of the elevator boy to ring his gong before and while descending.

In regard to the purpose of the gong, the following testimony appears in the record by Evans, the manager of the building: "Q. So long as the elevators had not been furnished and the equipment had not been completed, what measures did you take to insure against or prevent the occurrence of accidents in the use of the elevators? A. Practically nothing. There was nothing done to prevent accidents further than the installation of a gong on the elevators. Q. How would that prevent accidents? A. Just to warn those who were about the shafts. There were a good many people working in the elevator shafts during this time. Q. Actually working in the shafts themselves, do you mean? A. Yes; actually working in the shafts themselves. Q. What sort of work would they be doing in the shafts? A. Tile setting. Q. Was that while the elevators were going up and down? A. Yes. Q. Anybody who was wholly or partially in the shaft—was a gong put on there to warn him against the approach of the elevator? A. Yes. Q. And the elevator boy had to sound the gong? A. Yes; the operator had to sound

the gong.  Q. What means did they have of calling the elevator when it was a long distance up the shaft, how would the people down below notify the elevator boy what floor to come to?  A. They had no means other than the calling down the shaft or whistling; they had no signals of any description. A man had to depend upon his own voice; make his own signal.  Q. Was that the way in which the elevator was usually called, by people calling up and down the shaft? A. Yes; at that time that was the only means they had of calling him.  Q. They had to put their heads in somewhat to do that, didn't they?  A. If they did not, they got very poor results.  A man standing out in the corridor and simply calling or whistling towards the opening, he might as well have gone over in the other corner of the building, the sound would have dissipated, you could not have gotten it anywhere.  Q. He had to put his mouth in anyhow?  A. He had to at least do that much; yes."

Carl A. Carlson, the man who had charge of installing the elevators and a witness for appellant, testified that the gong was put on the car to warn ".working people around the shaft or in the building" that the car was in running motion.  This witness was asked: "After the cars once began to carry passengers up and down, did you notice about the frequency of the trips, how often they were run up and down?  A. I should say every ten minutes or so."

At the conclusion of the testimony appellee offered three prayers and appellant six.  Appellant excepted specially to appellee's second prayer "because it presents an abstract proposition of law."  The court granted appellee's second and third prayers and appellant's fourth and fifth prayers, and rejected appellee's first prayer and appellant's first, second, and sixth prayers, and overruled appellant's special exception.

The one bill of exception is to the overruling of appellant's special exception to appellee's second prayer, and to the rejection of appellant's first, second, and sixth prayers.

The *Reporter* will set out all the prayers of appellant and the second prayer of appellee.

We find no reversible error in the ruling on appellee's second prayer and appellant's special exception, provided there was no error in the refusal to direct a verdict for the appellant.

The sixth prayer of appellant omitted to require the jury to find that the failure of appellee to exercise reasonable care (if the jury should find such failure) directly contributed to the injury. Besides, appellant's fourth prayer correctly and clearly states the proposition of law involved in the sixth prayer.

There was no error, certainly no reversible error, in the rejection of the sixth prayer.

The question about which we have found serious difficulty is, should the case have been withdrawn from the jury because of contributory negligence?

On that question the case is very close to the border line, and it has been difficult to get away from the state of equipoise in which our minds were left by the cogent arguments of counsel on the respective sides. That condition of mind in itself seems to point to the correct conclusion, because if there is any doubt in the mind of the court as to whether any act of the plaintiff constitutes contributory negligence, it becomes a question for the jury.

*Thompson,* in his exhaustive and authoritative *Commentaries on the Law of Negligence,* at Section 1087, says: "It is contributory negligence, as matter of law, to put one's head into an elevator well for the purpose of shouting for the car to come down, or of seeing whether or not it is coming, or who is in it." And he cites in support of this proposition *Ramsdell* v. *Jordan,* 168 Mass. 505; *Mau* v. *Morse,* 3 Colo. App. 359, and several other cases. See also *Wright* v. *Selden-Breck Construction Co.,* 97 Nebraska, 840 (L. R. A. 1915 E. 740), and *Derringer* v. *Tatley,* 34 N. Dak. 43

(L. R. A. 1917 F. 187). Some of these cases in their facts are strikingly like the case at bar.

There probably can be found no dissent anywhere to the above proposition as applied to elevators regularly equipped and in full and regular operation. But in view of the decision in *Winkelmann & Brown Drug Co.* v. *Colladay,* 88 Md. 78, it cannot be said in this State that it is contributory negligence *per se* to put one's head in an elevator shaft under all circumstances, especially where apparently for the time being the elevator is not being operated.

And when it depends upon the circumstances and the conduct of the plaintiff is not such as to leave no room for difference of opinion in the minds of reasonable men as to its negligent character, the question should be submitted to the jury.

As we are unable to say in this case that there is undisputed evidence of any act of appellee about the negligent character of which, under all the circumstances, there is no room for difference of opinion in the minds of reasonable men, we must affirm the judgment.

*Judgment affirmed, with costs to appellee.*